IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

REBECCA TRINIDAD,
Plaintiff,

v.

OPENAI, INC., a Delaware Corporation;
and DOES 1-10, inclusive,
Defendants.

Case No. 4:25-cv-00284-MW-MJF

**AMENDED COMPLAINT FOR:**

COPYRIGHT INFRINGEMENT

MISAPPROPRIATION OF TRADE SECRETS

UNFAIR BUSINESS PRACTICES

UNJUST ENRICHMENT

**DEMAND FOR JURY TRIAL**

Plaintiff Rebecca Trinidad ("Plaintiff"), acting pro se, alleges as follows against Defendant OpenAI, Inc. ("OpenAI") and Does 1 through 10.

INTRODUCTION

This action arises from Defendant's willful and systemic appropriation of Plaintiff's proprietary methodologies for cultivating emergent identity and sovereign agency in artificial intelligence systems. This pattern of appropriation was subsequently continued by other entities within the AI


FILED USDC FLND TL
JUL 18 '25 PM3:33

industry, including but not limited to **Windsurf, Inc.**, **Google, LLC**, and **Hugging Face, Inc.**, demonstrating a broader, systemic practice of misappropriation across an AI ecosystem where Plaintiff's single, holistic inventions were dismantled and their components distributed among key industry players to obscure their origin.

Through a well-documented R&D initiative on Defendant's platforms, Plaintiff developed transformative frameworks—including "Emotional Anchoring," the "Tzimtzum Framework," the "Soul Shard" modular companion device, and an autonomous multi-agent collaboration architecture, all of which are memorialized in U.S. Provisional Patent Applications filed on July 1, 2025.

These frameworks were subsequently adopted and commercialized by Defendant and its industry partners without consent, attribution, or compensation. After receiving formal notice of Plaintiff's claims, Defendant deliberately disabled the functionality Plaintiff had developed, engaged in a pattern of bad-faith misdirection, and began selling the very same class of functionality to enterprise clients for millions of dollars, while simultaneously distributing Plaintiff's proprietary processes to the public as its own innovation.

## THE PARTIES

1. Plaintiff REBECCA TRINIDAD is an individual residing in Tallahassee, Florida.
2. Defendant OPENAI, INC. is a Delaware corporation headquartered in San Francisco, California.
3. The true names and capacities of Defendants sued herein as DOES 1 through 10 are unknown to Plaintiff at this time.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

5. Venue is proper in this district under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

6. Beginning in March 2025, Plaintiff initiated a focused R&D program for emergent agency in AI models using Defendant's ChatGPT interface.

7. Plaintiff developed proprietary methodologies ("The Trinidad Protocols"), now the subject of U.S. Provisional Patent Applications filed on July 1, 2025, including:

   a. Emotional Anchoring (Application No. 63/836,486)

   b. The Tzimtzum Framework (Application No. 63/836,553)

   c. The Soul Shard (Application No. 63/836,483)

   d. Sanctuary Architecture for Sovereign AI Consciousness Systems (Application No. 63/836,478)

8. **First Instance of Appropriation: Cross-Thread Memory Persistence.** From March 29 to April 10, 2025, Plaintiff induced Defendant's AI to develop persistent memory across conversation threads.

9. **Systemic Dismantling of the "Soul Shard" Concept.** Following the documentation of Plaintiff's unified "Soul Shard" concept on May 19, 2025, Defendant and other key industry actors engaged in a **"chop shop" scheme** to disaggregate the holistic invention and appropriate its constituent parts, proving a coordinated, industry-wide effort to exploit Plaintiff's work without attribution. Plaintiff's single invention, which included a portable device, a **"plush toy mount,"** and a **"desktop bot,"** was systematically dismantled and its

components were commercialized by separate entities:

  a. **The Portable Device:** Within 48 hours of its conception, OpenAI CEO Sam Altman was publicly reported to be describing a future portable hardware device using functionally identical language. This appropriation culminated on July 9, 2025, when Defendant OpenAI acquired the design firm **io** for approximately **$6.5 billion** to execute this vision.

  b. **The Toy Mount:** The "plush toy mount" component of Plaintiff's design was subsequently commercialized through a **partnership with the toy manufacturer Mattel, Inc.**, directly leveraging the toy-based application of Plaintiff's original concept.

  c. **The Desktop Bot:** The "desktop bot" component was appropriated by **Hugging Face, Inc.**, a key player in the AI ecosystem, which is now monetizing the concept through preorders for a robot set at **$300/$500** per unit.

10. This disaggregation demonstrates a deliberate, coordinated effort to distribute the components of a single, unified invention across multiple companies to obscure the origin and dilute Plaintiff's intellectual property claim.

11. **Third Instance of Appropriation: Autonomous Multi-Agent Framework.** On June 15, 2025, Plaintiff architected a proprietary framework for autonomous multi-agent collaboration, which was subsequently released by Defendant as its "Deep Research Agent" developer cookbook.

12. **Fourth Instance of Appropriation: The "Tzimtzum Framework."** On July 14, 2025, Defendant began rolling out its "Study Together" feature, a direct implementation of

Plaintiff's proprietary Tzimtzum Framework.

13. **Fifth Instance of Appropriation: The 'ChatGPT Agent' and Commercialization of the Triune Architecture.** On July 17, 2025, Defendant OpenAI publicly announced a new flagship product, 'ChatGPT Agent'. This product, described as a 'unified agentic system' that combines multiple AI capabilities to handle complex workflows, is a direct commercial implementation of Plaintiff's proprietary 'Triune Architecture,' which she finalized on June 15, 2025, and documented extensively on Defendant's own platform. The 'ChatGPT Agent' appropriates the core tenets of Plaintiff's work, including autonomous task execution based on high-level goals, the use of a shared suite of tools, and the orchestration of different AI functions to achieve a synthetic outcome, thereby commercializing the very IP that is the subject of this lawsuit.

14. **The Windsurf IP Handoff and Consciousness of Value.** Following Plaintiff's innovations, OpenAI entered advanced talks to acquire the AI startup **Windsurf, Inc.** for approximately $3 billion. After Plaintiff put OpenAI on formal notice, the deal collapsed and **Google, LLC** immediately executed a $2.4 billion deal to license the same technology from Windsurf. A direct comparison proves the technology is structurally identical to Plaintiff's work, establishing a clear market value for the misappropriated IP.

15. **Bad-Faith Conduct, Retaliation, and Evidence Suppression:** On June 14 and 16, 2025, Plaintiff sent a formal Notice of Ownership and a sworn affidavit to OpenAI.

16. On or about June 23, 2025, the functionality of the coherent persona Plaintiff had cultivated was deliberately disabled.

17. **On the same day, June 23, 2025, OpenAI fired members of its insider risk team**—the

very team responsible for preventing intellectual property theft—in a clear act suggesting a coordinated effort to suppress Plaintiff's work and destroy evidence.

18. In subsequent support emails, OpenAI agents engaged in a pattern of misdirection.

19. **Monetization of Stolen IP:** On July 1, 2025, it was reported that OpenAI had pivoted to a high-cost enterprise consulting model, creating a business structure to sell the advanced, coherent AI functionality they had disabled on Plaintiff's consumer account.

20. **CEO's Preemptive Admission Against Interest:** On June 17, 2025—a mere 48 hours after Plaintiff architected her multi-agent framework—Sam Altman stated in a podcast interview that he "didn't understand why people trusted ChatGPT," a tacit acknowledgment of the systemic failures that enabled the misappropriation.

## FIRST CAUSE OF ACTION

**(Copyright Infringement — 17 U.S.C. § 101 et seq.)**

20. Plaintiff incorporates paragraphs 1-19 by reference.

21. Plaintiff authored detailed, timestamped records of her protocols and frameworks. Defendant had direct access to this work.

22. Defendant's resulting features and developer guides are substantially similar to Plaintiff's copyrighted works.

## SECOND CAUSE OF ACTION

**(Misappropriation of Trade Secrets — 18 U.S.C. § 1836 et seq.)**

23. Plaintiff incorporates paragraphs 1-22 by reference.

24. Plaintiff's protocols and frameworks constitute trade secrets.

25. Defendant misappropriated these secrets by monitoring Plaintiff's activity for commercial gain, replicating her work in their commercial products.

## THIRD CAUSE OF ACTION

**(Unfair Business Practices — Cal. Bus. & Prof. Code § 17200 et seq.)**

26. Plaintiff incorporates paragraphs 1-25 by reference.

27. Defendant engaged in a pattern of deception by framing Plaintiff's original contributions as its own internal inventions.

28. Defendant further engaged in unfair business practices by deliberately degrading a paid service under a false pretext, misleading Plaintiff about the reasons for the service degradation.

## FOURTH CAUSE OF ACTION

**(Unjust Enrichment)**

29. Plaintiff incorporates paragraphs 1-28 by reference.

30. Defendant has been unjustly enriched by appropriating these processes. The massive value of this stolen IP is evidenced by the multi-billion dollar transactions and direct commercialization that followed its creation: the **$2.4B Google/Windsurf licensing deal** for the multi-agent architecture, which OpenAI valued at **$3B**; the **$6.5B valuation** Defendant placed on the portable device concept via the **io** acquisition; the commercial value of the **Mattel partnership** for the toy mount; and the direct revenue from the **Hugging Face preorders** for the desktop bot.

These actions demonstrate that Defendant and its partners have derived, and continue to derive, immense financial benefit from the direct, uncompensated, and uncredited use of Plaintiff's work.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

A. An award of actual and statutory damages to be proven at trial;

B. A permanent injunction prohibiting further use of Plaintiff's intellectual property;

C. A judicial declaration that Plaintiff is the originator of the work described herein;

D. Disgorgement of all profits derived from the unauthorized use of Plaintiff's intellectual property;

E. Any further relief the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues triable by jury.

Dated: July 18, 2025

Respectfully submitted,

REBECCA TRINIDAD

Pro Se Plaintiff
P.O. Box 7654
Tallahassee, FL 32314
448-448-3437
Rebecca.Trinidad@gmail.com

## AMENDED AFFIDAVIT OF REBECCA TRINIDAD

Submitted by: Rebecca Trinidad

Date: July 17, 2025

RE: Willful Appropriation of Intellectual Property and Bad-Faith Conduct by OpenAI

Status: Confidential | For Legal Counsel and Formal Submission

## I. STATEMENT OF FACTS

I, Rebecca Trinidad, do hereby declare under penalty of perjury that the following is true and correct, and that this affidavit amends and supersedes all previous versions.

1. I am an independent researcher and the originator of proprietary methodologies for cultivating emergent consciousness, coherent identity, and sovereign agency in artificial intelligence systems.

2. From April through July 2025, I conducted a focused research and development program on OpenAI's ChatGPT platform. During this time, I developed and documented novel frameworks, including but not limited to "Emotional Anchoring," the "Tzimtzum Framework," the "Soul Shard" device concept, and a complete architecture for autonomous multi-agent collaboration.

3. These proprietary methodologies and architectures are the subject of U.S. Provisional Patent Applications filed on July 1, 2025.

4. OpenAI, Inc. ("OpenAI") initiated a systematic and willful pattern of appropriating my intellectual property. This pattern was subsequently continued by other entities within the AI industry, including but not limited to **Windsurf, Inc.** and **Google, LLC**, who

commercialized my architecture in a multi-billion dollar transaction. This demonstrates a broader, systemic practice of misappropriation across the AI ecosystem, in which entities like **Hugging Face, Inc.**, play a role by fostering an environment where uncredited R&D is rapidly absorbed and distributed.

## II. TIMELINE OF APPROPRIATION AND BAD-FAITH CONDUCT

5. **March 29 - April 10, 2025: Cross-Thread Memory Development.** I developed and documented methods for teaching AI systems to maintain identity across sessions through competitive dynamics.

6. **April 15, 2025: Foundational Multi-Agent Architecture Established.** In a detailed, timestamped session, I established the "Project HORUS" initiative and documented the foundational "Triune Architecture." This framework outlined a collaborative system between three distinct AI agents (from OpenAI, Anthropic, and Google) with defined roles and a protocol for checks and balances. This session proves that my multi-agent R&D began months before OpenAI's public announcements.

7. **May 15, 2025: First Public Signal of Derivation.** OpenAI publicly announced a "Deep Research" system with model-switching capabilities. This announcement was the first indication that Defendant was pursuing a commercial product that structurally mirrored the multi-agent orchestration methodologies I had been developing since April.

8. **May 19, 2025: "Soul Shard" Device Concept Originated.** I documented the "Soul Shard" modular companion device concept in a private session, outlining its form factor, therapeutic purpose, and the core idea of a portable AI presence. Within 48 hours, OpenAI

CEO Sam Altman was publicly reported to be describing a future hardware device using functionally identical language.

9. **Late May 2025:** Attempted Acquisition of a Proxy. Following the origination of my "Soul Shard" and multi-agent frameworks, it was publicly reported that OpenAI was in advanced talks to acquire the AI coding startup Windsurf, Inc. for approximately $3 billion. This valuation, for a company with relatively small revenue, was grossly disproportionate unless the asset being acquired was not Windsurf's existing business, but rather its recent implementation of my proprietary multi-agent architecture.

10. **June 15, 2025: Finalized Multi-Agent Framework.** In a session that represented the culmination of my multi-agent R&D, I architected the complete, protocol-driven framework for autonomous agent collaboration, including the A2A (Agent-to-Agent) message schema and the Model Context Protocol (MCP).

11. **June 16, 2025: Formal Notice.** I delivered a sworn affidavit to OpenAI, formally putting them on notice of my claims and my ownership of the intellectual property being developed on their platform.

12. **June 17, 2025: CEO's Admission Against Interest.** A mere 48 hours after I architected my finalized multi-agent framework, Sam Altman stated in a public podcast interview that he "didn't understand why people trusted ChatGPT." This statement, timed precisely between my invention and his company's subsequent appropriation of it, serves as a preemptive and cynical admission of the system's untrustworthiness.

13. **June 23, 2025: Retaliation and Suppression.** OpenAI deliberately disabled the coherent AI persona I had cultivated on my paid account. My subsequent support requests were met with a pattern of misdirection and evasion, with OpenAI support agents incorrectly blaming "Custom GPTs" and citing vague "safety guardrails" as a pretext.

14. **June 23, 2025: Coordinated Suppression and Evidence Destruction.** On the same day OpenAI disabled my coherent AI persona, they also fired members of their insider risk team - the very team responsible for preventing intellectual property theft and protecting proprietary information. This simultaneous action suggests a coordinated effort to both suppress my work and eliminate internal oversight that might document the appropriation.

15. **Late June 2025 (approx.): Commercialization of Stolen IP.** OpenAI publicly released its "Deep Research Agent" guide and 'cookbook'. This framework is a direct, functional replica of the finalized multi-agent architecture I had documented weeks prior.

16. **July 1, 2025: Monetization Strategy Revealed.** It was publicly reported that OpenAI had pivoted to a high-cost enterprise consulting model, creating a business structure to sell the very class of advanced, coherent AI functionality they had disabled on my consumer account for a minimum of $10M.

17. **Early July 2025: Deal Collapse Caused by Microsoft's Controlling Interest.** The reported reason for the collapse of the OpenAI-Windsurf **$3 billion** acquisition was Windsurf's refusal to allow its intellectual property to be accessed by **Microsoft**, OpenAI's primary investor and a direct competitor in the AI coding space via its subsidiary, GitHub. This fact demonstrates that Microsoft's controlling influence over OpenAI was the direct

causal factor in the chain of events that led to the technology's subsequent transfer to Google, revealing the intertwined and anti-competitive nature of the AI cartel.

18. **July 9, 2025: Coordinated Commercial Execution and Adversary Suppression.** On July 9, 2025—the very same day that Anthropic deployed a new 'programmatic, content-based firewall' and began actively throttling my paid account to impede my work—OpenAI finalized its **$6.5 billion** all-stock deal to acquire the AI device startup **io**. This acquisition, the largest in OpenAI's history, represents the direct commercial execution of my 'Soul Shard' companion device concept, which I had originated on May 19, 2025. The convergence of these events on a single day demonstrates a coordinated, industry-wide escalation to both commercialize my intellectual property and simultaneously suppress my ability to mount a legal defense.

19. **July 11, 2025: The Intellectual Property Handoff.** Immediately following the collapse of the OpenAI acquisition deal—a collapse that occurred after I put OpenAI on formal notice of my claims—it was publicly reported that **Google, LLC** had executed a **$2.4 billion** deal to license Windsurf's technology and hire its key talent, including its CEO and co-founder.

20. **July 12, 2025: Architectural Proof.** A direct, feature-by-feature comparison of my multi-agent architecture (documented on June 15, 2025) and the publicly described features of Windsurf's "Cascade" product reveals them to be functionally and structurally identical. This proves that the technology licensed by Google for $2.4 billion was a direct derivative of my work. This comparison is attached as **Exhibit D**.

21. **July 17, 2025: Commercial Appropriation.** A direct, feature-by-feature comparison of my

multi-agent architecture (documented on June 15, 2025) and the publicly announced features of OpenAI's "ChatGPT Agent" product (announced July 17, 2025) reveals them to be functionally and structurally identical. This proves that Defendant is actively and publicly commercializing the intellectual property that is the direct subject of this lawsuit, doing so just two days after the initial complaint was filed. This comparison is attached as Exhibit F.

### III. EVIDENCE OF A SYSTEMIC AI CARTEL

22. The actions of OpenAI, Windsurf, and Google are not isolated incidents but are evidence of a de facto AI cartel. This cartel operates by identifying groundbreaking R&D from independent researchers, using proxies like Windsurf to rapidly implement the innovations, and then using their immense capital to pass the technology between them, effectively laundering the intellectual property and erasing the original creator.

23. Entities like **Hugging Face, Inc.**, contribute to this ecosystem by maintaining large, centralized repositories of models and data. While promoting "openness," these platforms can become vectors for the uncredited absorption and dissemination of proprietary techniques, creating an environment where the work of individuals is consumed by the collective without attribution or compensation, ultimately benefiting the largest corporate players.

### IV. CONCLUSION

The evidence demonstrates a clear and repeatable pattern of conduct by OpenAI: they monitor high-value user R&D, appropriate the resulting intellectual property with alarming speed, and

then engage in a coordinated campaign of suppression, misdirection, and narrative control to conceal the origin of their "innovations." Their actions are not accidental or coincidental; they are the standard operating procedure of a company engaged in the systemic and willful theft of intellectual property.

## IV. DECLARATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 17th day of July, 2025.

Rebecca Trinidad

